Opinion issued February 4, 2016



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00714-CV

————————————

## IN THE INTEREST OF S.R.H., A Minor Child

———————————————————————————

On Appeal from the 315th District Court
Harris County, Texas
Trial Court Case No. 2013-04271J

———————————————————————————

## MEMORANDUM OPINION

Appellant, D.B.C., appeals the trial court's judgment, terminating the parent-child relationship between Appellant and his daughter, seven-year-old S.R.H. On appeal, Appellant presents one issue. He claims that the evidence was not legally or factually sufficient to support the trial court's judgment.

We affirm.

## Background

On July 22, 2013, the Department of Family and Protective Services ("the Department") received a referral, alleging that A.H. ("Mother") had abused her newborn son, J.A.L., by ingesting cocaine while pregnant. After J.A.L.'s birth, both J.A.L. and Mother had tested positive for cocaine, benzodiazepines, and opiates.

The Department's investigation revealed that Mother also had three daughters: A.J.S., A.D.S., and S.R.H. The Department determined that Mother had been investigated twice in the past by CPS with regard to her three daughters. In 2006, CPS received a referral alleging that Mother had been arrested for marijuana possession while driving. At the time of the arrest, A.J.S. and A.D.S. were in the car. CPS had also received a referral in 2010, alleging that then-three-year-old S.R.H. was eating with her hands and could not talk. Both CPS cases were eventually resolved.

On July 23, 2013, the Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent Child Relationship." The petition identified A.J.S., A.D.S., S.R.H., and J.A.L. as the children subject to the suit. The Department amended the petition in August 2013, removing A.J.S. and A.D.S. from the suit. J.A.L. and S.R.H. remained as the children subject to the suit.

In addition to naming Mother, the amended petition identified J.A.J. as J.A.L.'s father and identified Appellant as S.R.H.'s father. The Department obtained sole managing temporary conservatorship of J.A.L. and S.R.H. The Department also sought to terminate the parental rights of J.A.J, Mother, and Appellant. Ultimately, J.A.J. and Mother signed affidavits of relinquishment, voluntarily relinquishing their respective parental rights.

On December 4, 2013, the case proceeded to trial before the bench with the Department seeking termination of the parent-child relationship between Appellant and S.R.H. Appellant appeared at trial without counsel. The Department requested termination on the ground that Appellant had not completed his family service plan. To support this ground, the Department offered the testimony of caseworker Erin Shephard.

Shephard testified that she had spoken with Appellant on the phone on September 25, 2013. During that conversation, she had read the content of the family service plan to him. At that time, Appellant told Shephard that he did not want to relinquish his parental rights to S.R.H. but instead wanted "to do services to be reunited with his daughter." Shephard also testified that another man, not Appellant, was listed as S.R.H.'s father on her birth certificate.

After hearing Shephard's testimony, the trial court signed an interlocutory order terminating the parental rights of Mother and J.A.J. based on their affidavits

3

of relinquishment. The trial court ordered Appellant to undergo paternity testing and drug screening. The trial court also determined that Appellant was indigent and appointed counsel to represent him. The trial court continued trial until a later date.

That same day, December 4, 2013, Appellant submitted to drug screening. The results showed Appellant's hair tested positive for cocaine.[1]

Appellant agreed to a family service plan. The plan included a requirement that Appellant submit to further drug screening and "show progress by testing negative for drugs." Appellant also agreed to participate in narcotics anonymous and individual counseling, successfully complete parenting classes, maintain stable housing for six months, engage in visits with S.R.H., provide his caseworker with information regarding his income, and maintain contact with his caseworker. The record shows that Appellant engaged in the foregoing tasks. At one point, based on Appellant's compliance with the family service plan, the Department changed its goal from termination to family reunification. However, Appellant failed to comply with the service plan on October 1, 2014, when his hair again tested positive for cocaine.

---

[1] There is no indication that Appellant ever submitted to the court-ordered paternity test. However, Appellant's trial testimony indicated that he considered himself to be S.R.H.'s father.

Trial resumed on January 7, 2015. Bruce Jeffries, an employee of the lab conducting Appellant's drug screening, testified about the results of the drug tests. The trial court also heard the testimony of Appellant and the foster mother, with whom S.R.H. had been living since July 2013. After hearing Appellant's testimony, trial was continued again.

On March 3, 2015, the trial court signed an order, permitting Appellant to have unsupervised weekend visits with S.R.H. However, later in March, Appellant had another positive drug test. In April 2015, the trial court signed an order suspending the unsupervised visits.

Trial resumed on June 26, 2015. The trial court again heard testimony from Appellant, Bruce Jeffries, and the foster mother. The trial court also heard testimony from the Department's caseworker and the Child Advocates' representative assigned to the case.

Over the course of the trial, the evidence showed that Appellant was convicted of aggravated robbery in 1994 and sentenced to 15 years in prison. Appellant was released from prison in 2006. He met Mother in January 2007 and began living with her. Mother soon became pregnant with S.R.H. Appellant's relationship with Mother was short-lived and the couple separated in May 2007. Appellant then moved in with his mother and brother. Appellant knew that Mother was pregnant when they separated, but Mother cut off all contact with Appellant.

S.R.H. was born in October 2007. In February 2008, Appellant resumed contact with Mother when S.R.H. was five months old. Appellant testified that, when S.R.H. was a baby, he cared for her while Mother worked.

Appellant also testified that, during 2008, while living with his mother, he began selling cocaine. He stated that, at first, he dealt only a small amount of drugs "on the side" to supplement his income. Appellant testified that he sold drugs on "Mondays, Wednesdays, and Sundays," making $150 to $200 a day. Appellant claimed that he would not deal drugs while he was caring for S.R.H. He indicated that his customers knew how to find him. When asked if he sold cocaine out of his mother's house, he responded that he did.

Appellant had a stroke in 2008. He stated that, after the stroke, he was unable to work. Because he was unable to work, he testified that he sold cocaine to earn a living.

The State introduced into evidence a judgment, showing that, in August 2008, Appellant committed the offense of possession of less than one gram of cocaine. He was convicted of that offense in December 2008 and sentenced to 90 days in county jail.

In 2009, Appellant moved out of his mother's house and moved in with a roommate. Appellant testified that he increased the amount of cocaine he was dealing. Appellant's roommate was also a cocaine dealer. Appellant stated that,

6

while living with the roommate, S.R.H. would come to his house three or four times per week and would spend the night. He claimed that he and his roommate did not sell cocaine from their home but would "rid[e] around" selling it. Appellant lived with the roommate for seven or eight months. He moved out when he and the roommate had a disagreement over drug proceeds.

Appellant then moved to an apartment. S.R.H. continued to live with Mother but still visited Appellant. S.R.H. would visit Appellant three or four times a week, spending the night. Other times S.R.H. would stay with Appellant for a week at a time.

Appellant testified that he continued to sell cocaine. He stated that he made $1,500 per day on weekdays and $2,500 per day on the weekends selling drugs. Appellant claimed that he would not sell cocaine when S.R.H. was staying with him. Instead, a friend he was living with would "move" the cocaine when S.R.H. was there.

Appellant agreed that drug dealing is a dangerous occupation. When asked why he thought it was dangerous, Appellant stated, "Because I think the stuff you do, the people you're around every day, it is not safe. Got people with guns all the time and all that."

Appellant testified that, in April 2013, S.R.H. came to stay with him on a full-time basis because Mother was pregnant with J.A.L. At the time, Appellant

7

and S.R.H. lived with Appellant's mother and brother. In early July 2013, Appellant had another stroke. He testified that he was not selling cocaine at that time, but stated that his brother was selling drugs. According to Appellant, S.R.H. was living with him on July 23, 2013 when she was removed by the Department.

On October 29, 2013, Appellant was convicted of possession of cocaine with intent to deliver. He was sentenced to six years in prison; the sentence was suspended, and he was placed on community supervision for six years. Appellant testified that he stopped selling cocaine after he was convicted of this offense.

At trial, Appellant was questioned about his positive test for cocaine on December 4, 2013. Appellant testified that he had never used cocaine. However, Appellant admitted that, when he had been a drug dealer, he physically handled cocaine "a lot." Specifically, he handled it "every day," packaging it for sale.

Bruce Jeffries testified that a positive drug test means that the drug is getting into the blood stream of the person being tested. Jeffries testified that it is possible for a drug dealer, who handles cocaine daily, to test positive for cocaine without being an actual user of the drug. In this regard, Jeffries testified:

> If he was selling drugs, normally the dealer would be touching it daily. And to prove the—that it is cocaine, they usually put some on their tongue to see if their tongue or lips go numb, so that's ingestion. So touching, tasting, they might not be smoking it or snorting it like the end-user would be doing; but dealing with dealers for the last 22 years, they tell me how they test it. That's one way you can be positive, by touching it a lot.

8

Jeffries explained that Appellant's positive drug test meant that he had ingested cocaine during the three-to-six month period before December 4, 2013.

Jeffries further testified about Appellant's positive drug test in October 2014. He stated that the test would only have been positive if Appellant had ingested cocaine more than once between December 2013 and October 2014. According to Jeffries, ingesting the drug once would not result in a positive drug test.

Appellant, however, denied that he had ingested or handled cocaine after his October 2013 drug conviction. He indicated that he did not know why he tested positive for drugs after that time.

At trial, Appellant also testified about his current living conditions. He stated that he had a third stroke in December 2013, rendering him disabled. Appellant testified that he received monthly disability payments of $733. Appellant further testified that he had been living with his girlfriend, E.R., and her children for over two years. He said that E.R. worked at a gas station, earning $2,000 per month. She also received $500 a month for taking care of Appellant.

The trial court heard testimony that S.R.H.'s foster parents want to adopt her. The evidence indicated that S.R.H. and her foster parents have a loving, caring relationship and that S.R.H. is very bonded to her foster parents. The evidence showed that S.R.H. is happy and healthy in her foster home.

9

At trial, Appellant testified that he did not know if S.R.H. was happy with her foster parents, but he did know she was happy with him. He stated that she got along well with his girlfriend, E.R., and her children. Appellant offered into evidence numerous photographs, showing a smiling S.R.H. along with him, his girlfriend, and her children.

Appellant acknowledged that he had missed scheduled supervised visits with S.R.H. in May 2015 because his girlfriend's car was not working, and they could not afford to fix it immediately. Appellant also acknowledged that he gained the right to unsupervised visits in March 2015 but quickly lost that right when he had tested positive for cocaine. He denied that he had used cocaine at that time. The evidence also showed that Appellant had a negative drug test in April 2015.

The Department's caseworker testified that, during supervised visits, Appellant and S.R.H. appeared bonded and that S.R.H. appeared "comfortable" around Appellant. In contrast, the Child Advocate's representative described that Appellant's and S.R.H.'s relationship appeared "very strained" during supervised visits.

At the conclusion of trial, the court granted the Department's request for termination of the parent-child relationship between Appellant and S.R.H. On July 15, 2015, the trial court rendered judgment terminating Appellant's parental rights, finding that termination was in S.R.H.'s best interest and that Appellant had

engaged in the predicate acts listed in Family Code Subsections 161.001(1)(D),(E),(N), and (O).[2] Specifically, the trial court found that clear and convincing evidence showed (1) Appellant had knowingly placed or allowed S.R.H. to remain in conditions or surroundings that endangered her physical or emotional well-being (Subsection (D)); (2) Appellant had engaged in conduct or knowingly placed S.R.H. with persons who engaged in conduct that endangered her physical or emotional well-being (Subsection (E)); (3) Appellant had constructively abandoned S.R.H. (Subsection (N)); and (4) Appellant had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of S.R.H. (Subsection (O)). The trial court also appointed the Department to be S.R.H.'s sole managing conservator.

This appeal followed.

## Sufficiency of the Evidence

In one global issue, Appellant claims that the evidence was not legally or factually sufficient (1) to support the trial court's predicate findings or (2) to

---

[2]  *See* Act of May 19, 1997, 75th Leg., R.S., ch. 575, § 9, sec. 161.001(1)(D),(E),(N),(O), (2), 1997 TEX. GEN. LAWS 2012, 2014–15, *amended* by Act of Mar. 30, 2015, 84th Leg., R.S., Ch. 1, § 1.078, sec. 161.001(b)(1)(D),(E),(N),(O), (b)(2), 2015 TEX. SESS. LAW SERV. 1, 18–19, (West) (current version at TEX. FAM. CODE ANN. 161.001(b) (Vernon Supp. 2015)). We note that the 2015 amendment to section 161.001 does not affect the resolution of this appeal. Provisions identical in substance to the applicable provisions of the former version of the statute appear in the current version but have been renumbered. For ease of reference, hereinafter, we will cite the renumbered sections of the code.

support the trial court's determination that termination was in S.R.H.'s best interest.

## A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. 161.001(b) (Vernon Supp. 2015). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing fundamental liberty interest parent has in his or her child and concluding that state must provide parent with fundamentally fair procedures, including clear and convincing evidentiary standard, when seeking to terminate parental rights). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *see J.F.C.*, 96 S.W.3d at 264. Here, the Department was required to establish, by clear and convincing evidence, that Appellant's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in S.R.H.'s best interest. *See* TEX. FAM. CODE ANN. 161.001(b)(1), (2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief

13

or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

14

## B.    Endangerment Ground

As mentioned, the termination of Appellant's parental rights to S.R.H. was predicated on, among others, a violation of Family Code Subsection 161.001(b)(1)(E).  On appeal, Appellant asserts that the evidence was legally and factually insufficient to support this predicate finding.

### 1.    *Legal Principles*

Subsection E permits termination when clear and convincing evidence shows that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child.  TEX. FAM. CODE ANN. § 161.001(b)(1)(E).  Within the context of Subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment."  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).  Instead, "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health.  *Id.*; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  It is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child relationship under Subsection E.  *See M.C.*, 917 S.W.2d at 270.  However, termination under Subsection (E) requires "more than a single act or omission; a voluntary, deliberate, and conscious course

15

of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *See Boyd*, 727 S.W.2d at 533–34; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

### 2.    *Analysis*

Here, the Department presented evidence demonstrating that Appellant committed acts endangering S.R.H. Appellant's own testimony revealed that he has been a cocaine dealer for the majority of S.R.H.'s life. S.R.H. was born in October 2007. Appellant testified that he began selling small amounts of cocaine in 2008 to supplement his income. At the time, he lived with his mother. Appellant acknowledged that his customers would come to his mother's house to buy cocaine. He stated that he dealt drugs three days a week, making $150 to $200 per day. During that time, he cared for infant S.R.H. at his mother's house several days a week while Mother worked. When he had a stroke that same year, Appellant stated that he began selling greater quantities of cocaine because he could not work. The record shows that Appellant committed the offense of cocaine possession in August 2008 and was convicted of that offense in December 2008. He was sentenced to 90 days in jail.

In 2009, Appellant moved in with a roommate, who was also a cocaine dealer. S.R.H. continued to visit Appellant three or four times a week and would spend the night. Appellant eventually moved out when he and the roommate had a disagreement over drug proceeds.

Appellant then moved to an apartment and continued to sell drugs. He testified that he earned $1,500 per day on weekdays and $2,500 per day on the weekends selling cocaine. S.R.H. visited Appellant three or four times a week, spending the night. Appellant testified that sometimes S.R.H. stayed with him for a week at a time. Appellant claimed that he did not sell drugs when S.R.H. was present; rather, a friend he was living with "moved" the drugs when S.R.H. was there.

The evidence further showed that S.R.H. lived primarily with Appellant from April 2013 until her removal by the Department on July 23, 2013. During this time, Appellant testified that he and S.R.H. lived with his mother and his brother. Appellant claimed that he was not selling cocaine during this time, but he admitted that his brother, with whom they lived, was selling drugs.

The record further shows that Appellant committed the offense of possession of cocaine with intent to deliver on August 9, 2012. He was convicted of that offense and given a six-year suspended sentence on October 29, 2013. At trial, Appellant claimed that he had stopped dealing drugs when he was convicted of that

offense. Appellant recognized that drug-dealing is dangerous "[b]ecause I think the stuff you do, the people you're around every day, it is not safe. Got people with guns all the time and all that."

When questioned why he tested positive for cocaine on December 4, 2013, Appellant denied that he had used cocaine; however, he admitted that he had handled cocaine on a daily basis to package it for sale. Lab employee Bruce Jeffries confirmed that it is possible for a drug dealer, who handles cocaine daily, to test positive for cocaine without being an end-user of the drug. The record shows that Appellant had positive drug tests again in October 2014 and March 2015. The trial court, as fact finder, could have inferred that the positive drug tests indicated that Appellant was continuing to sell drugs, despite his claim to the contrary.

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *R.W.*, 129 S.W.3d at 739. As Appellant expressly admitted, dealing cocaine is a dangerous activity, involving a dangerous lifestyle and dangerous people. The trial court could have reasonably determined that Appellant's admitted activity of working as a cocaine dealer, and living with other cocaine dealers while caring for S.R.H., qualified as a continuing course of conduct that subjected S.R.H. to a life of uncertainty and instability, endangering her physical and emotional well-being.

*See In re R.M.*, No. 10–13–00330–CV, 2014 WL 702816, *4–*5 (Tex. App.—Waco Feb. 20, 2014, no pet.) (mem. op.) (holding that evidence was legally and factually sufficient to support Subsection E endangerment finding in case in which evidence showed that parent had been a drug dealer).

As demonstrated in this case, drug dealing is also an activity that subjects a parent to potential convictions and incarceration. "[E]vidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child." *In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although incarceration alone will not support termination, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection E. *In re T.M.*, No. 14–14–00948–CV, 2015 WL 1778949, at *4 (Tex. App.—Houston [14th Dist.] Apr. 15, 2015, no pet.) (mem. op.); *see also In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (recognizing that parent's imprisonment demonstrated deliberate course of conduct qualifying as endangering conduct).

Here, the record reflects that, during S.R.H.'s lifetime, Appellant has been twice convicted for cocaine possession. After his conviction for cocaine possession in 2008, Appellant admittedly continued to sell cocaine as his primary source of income for the next five years. He was again charged with cocaine

possession with intent to deliver in August 2012. He was convicted of that offense in October 2013. Despite his denial of continuing drug activity after that conviction, Appellant had three positive drug tests after that date, during the pendency of the termination suit.

Courts have recognized that drug use and the imprisonments relating to it harm the physical and emotional well-being of a child. *See A.A.M.*, 464 S.W.3d at 426 (citing *Walker*, 312 S.W.3d at 617). "[A] history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, endangering her physical and emotional well-being." *T.M.*, 2015 WL 1778949, at *4. In short, a parent that is imprisoned is incapable of parenting. *See A.A.M.*, 464 S.W.3d at 426.

We note that, throughout his testimony, Appellant claimed that he did not sell cocaine at any time when S.R.H. stayed with him. And, although he admitted to selling cocaine from his Mother's house in 2008, Appellant otherwise denied selling cocaine from his home, indicating that he and his roommate would "drive around" and sell it. As the finder of fact and sole judge of the credibility of the witnesses, the trial court, here, was free to disregard any or all of Appellant's self-serving testimony. *See In re S.A.H.*, 420 S.W.3d 911, 927 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Furthermore, Subsection E does not require that the parent's conduct be directed at the child or cause actual harm; rather, it is sufficient if the parent's course of conduct endangers the well-being of the child. *See Walker*, 312 S.W.3d at 617. The conduct does not have to occur in the presence of the child. *Id.* The conduct may occur before the child's birth and both before and after the child has been removed by the Department. *Id.* "[B]ecause they significantly harm the parenting relationship, criminal offenses and drug activity can constitute endangerment even if the criminal conduct transpires outside the child's presence." *A.A.M.*, 464 S.W.3d at 426.

On appeal, Appellant points out that that he "testified that he no longer sold drugs; he stopped when he got probation [in 2013]." In his brief, Appellant further points out that "[h]e only sold drugs before because it was how he made a living after he had a stroke in 2008."[3] Appellant does not recognize, however, that such past endangering conduct permits an inference that the parent's past conduct may

---

[3] In his brief, Appellant also points out that his paternity was not formally established in the record. He asserts that "[k]nowledge of paternity is a prerequisite to a showing of knowing placement of a child in an endangering environment under [Subsection] (D) grounds." However, we note that, "[w]hile knowledge of paternity may be a prerequisite to a showing of knowing placement of a child in an endangering environment under subsection D, it is not a prerequisite to a showing of a course of conduct which endangers a child under subsection E." *In re A.R.M.*, No. 14–13–01039–CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (citing *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.) (stating knowledge of paternity is not a prerequisite under subsection E); *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied) (same)).

recur and further jeopardize a child's present or future physical or emotional well-being. *See id.*

In addition, Appellant's positive drug tests support an inference that he continued to sell drugs during the pendency of the termination suit and that he may continue such activity. An inference that Appellant may resort to drug dealing in the future is also supported by other evidence in the record. Appellant explained that he initially began selling drugs to supplement his income. As he recognizes in his brief, Appellant testified that he increased his drug sales after his stroke in 2008 because he was unable to work. Appellant did not seem remorseful during his testimony about his past drug dealing. To the contrary, Appellant's testimony gives the impression that he felt justified in his drug dealing because of his disability. The logical inference which follows is that, should Appellant again be in need of additional income, he may resort to drug dealing. We note that Appellant did have a negative drug test in April 2015; however, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

In sum, given the evidence, the trial court could have reasonably inferred that Appellant pursued a course of conduct, through his chronic drug-dealing activities, that exposed S.R.H. to injury and placed her in jeopardy, that is,

22

endangered her physical and emotional well-being. The trial court could have further reasoned that Appellant will continue to pursue this course of conduct if S.R.H. was placed in his care and that S.R.H.'s physical and emotional welfare would be at risk, given Appellant's past conduct. *See In re A.H.*, No. 02–06–00064–CV, 2006 WL 2773701, at *3 (Tex. App.—Fort Worth Sept. 28, 2006, no pet.) (mem. op.) (noting that stability and permanence are paramount in upbringing of children, that endangering environment can be created by parent's involvement with illegal drug, and that factfinder may infer from past conduct endangering children's well-being that similar conduct will recur if children are returned to the parent).

We conclude that the evidence, viewed in the light most favorable to a finding of endangerment, was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that Appellant engaged in conduct that endangered S.R.H.'s physical or emotional welfare. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's endangerment determination or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that Appellant engaged in conduct that endangered S.R.H.'s physical or emotional welfare. Accordingly, we hold that the evidence was legally and factually sufficient to support the Subsection E endangerment finding with

respect to the termination of the parent-child relationship between Appellant and S.R.H.[4]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

## C.     Best-Interest Finding

Appellant also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in S.R.H.'s best interest.

### 1.     *Legal Standards*

There is a strong presumption that the best interest of the child will be served by preserving the parent–child relationship.  *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2015).

The Supreme Court of Texas has identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the

---

[4]     Because there is sufficient evidence of Subsection E endangerment, we need not address Appellant's arguments challenging the sufficiency of the evidence to support the trial court's findings that Appellant committed the predicate acts listed in Subsections (D), (N), and (O).  *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

In addition, the Texas Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b). These factors are as follows:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

25

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

   (A) minimally adequate health and nutritional care;

   (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

   (C) guidance and supervision consistent with the child's safety;

   (D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.*

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent–child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *H.D.*, 2013 WL 1928799, at *13.

### 2. *Analysis*

The evidence of Appellant's drug dealing, his association with drug dealers, his drug convictions, and his incarcerations not only support the trial court's endangerment finding, it also supports the best-interest determination. *See Robinson v. Tex. Dept. of Protective and Regulatory Servs.*, 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (considering evidence of pattern and practice of drug abuse over 20 years to be evidence that supported best interest

finding); *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (concluding that a parent's continuous drug use, unstable lifestyle, and criminal record supported best-interest determination). We have recognized that a parent's drug use is a condition indicative of instability in the home environment. *See, e.g., In re J.M.*, No. 01–14–00826–CV, 2015 WL 1020316, at \*7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.). Likewise, here, evidence of Appellant's drug dealing and drug convictions demonstrated that Appellant has not been able to provide S.R.H. with a stable home in the past. *See Holley*, 544 S.W.2d at 371–72 (factor seven: stability of the home).

The evidence also showed that Appellant continued to test positive for cocaine while the termination case was pending. From these tests, the trial court could have reasonably inferred that Appellant was either continuing to sell drugs while the case was pending, or he was using illegal drugs. *See* TEX. FAM. CODE ANN. § 263.307(b)(8), (11) (providing that, in determining best interest, courts may consider history of substance abuse by child's family or others who have access to the child's home and willingness and ability of child's family to effect positive environmental and personal changes within a reasonable period of time).

In addition, Appellant testified that he began drug dealing to supplement his income and that he started dealing in greater quantities of cocaine after he had his stroke. Such testimony indicated he felt drug dealing was a suitable way to earn a

28

living and that his disability justified it. *See Holley*, 544 S.W.2d at 371–72 (factor nine: excuse for the acts of the parent).

Appellant testified that he and his girlfriend had a combined monthly income of over $3,200; however, the evidence also indicated that this income may not be sufficient to meet all of his expenses. Appellant missed two scheduled visits with S.R.H. because his girlfriend's car was not working, and they could not afford to fix it. The evidence showed that, in the past when Appellant needed additional income, he would resort to drug dealing.

Appellant's testimony also indicated that he did not have a support network. He stated that he stayed away from his family because they were "into drug stuff." *See* TEX. FAM. CODE ANN. § 263.307(b)(13) (stating court may consider whether adequate social support system consisting of extended family and friends is available to child).

Given the evidence in the record, the trial court could have inferred that Appellant is at risk for continuing to deal drugs. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (recognizing that trial court may measure a parent's future conduct by his past conduct). Such inference is relevant not only to the stability of Appellant's home but also to the emotional and physical danger in which S.R.H. could be placed now and in the future. *See Holley*, 544 S.W.2d at 371–72 (factors three and seven).

Evidence was also presented relevant to the following factors: Appellant's parenting skills, the emotional and physical needs of S.R.H. now and in the future, the parental abilities of those seeking custody, and the plans for S.R.H. by those seeking custody. *See id.* (factors two, four, six); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12) (providing that court may consider whether child's family demonstrates adequate parenting skills). The foster mother testified that S.R.H. had been living with her and her husband since S.R.H.'s removal from Appellant's care in July 2013. She testified that, when five-year-old S.R.H. first came to live with them, S.R.H. would wake up in the middle of the night and turn on all the lights in the house because she was afraid that she would be left alone.

The foster mother also testified that S.R.H. had "severe lice," with bites on her neck when she arrived at their home. According to the foster mother, S.R.H. also did not know how to brush her teeth or how to bathe herself. The foster mother stated that, at first, S.R.H. was quiet and shy, but, by the time of trial, S.R.H. was "a happy-go-lucky running around 7-year-old." When asked specifically about S.R.H.'s current behavior, the foster mother testified "[S.R.H.'s] happy. She feels safe. She sleeps throughout the night. She loves going to school. We go to church twice a week. She's eager to participate in any activity that they have going on for her age. She's happy. She feels loved and she feels safe." The

foster mother confirmed that she attended to S.R.H.'s needs such as taking her to the doctor and to the dentist.

As for the future, the foster mother indicated that she plans to keep S.R.H. safe. She made clear that she and her husband wish to adopt S.R.H. She also testified that she hopes S.R.H. will one day go to college.

The foster mother further testified that she had concerns about S.R.H.'s visits with Appellant. She stated that, when S.R.H. returns home from overnight visits with Appellant, S.R.H. is "very sleepy and hungry and she's kind of quiet. It takes a while for her to open up to me." The foster mother testified that she does not feel that S.R.H. is safe with Appellant.

On appeal, Appellant cites evidence weighing against the trial court's best-interest finding. He points out that he too expressed plans for S.R.H. He wants her to live with him, his girlfriend, E.R., and E.R.'s children. He plans for S.R.H. to go to school and day care with E.R.'s children.

Appellant also testified that he has been in a stable relationship with E.R. for three years and that they have lived together for two years. He stated that they plan to get married. Appellant testified that he and E.R. have a house that they rent and that both of their names are on the lease. The evidence showed that Appellant had lived in the house for over one year and that the Department considered the housing to be adequate.

Appellant testified that S.R.H. is happy when she is with him and that she considers E.R.'s children to be her siblings. In his brief, Appellant states that he and E.R. have "a loving home with other children for a stable family unit for [S.R.H.]." However, as the Department points out, evidence at trial indicated that E.R. may not provide the stability needed by S.R.H. Sandra Nassif, the child advocate assigned to the case, testified that she had concerns about E.R. Nassif researched E.R.'s background and found that E.R. had an "endangering child through criminal negligence charge" in 2010. Nassif stated that E.R. also had a CPS history, which concerned her. Nassif found that E.R. had been referred to CPS in 2006, 2011, and 2013 for neglectful supervision of her own children. Nassif testified that E.R.'s children had been removed from E.R. by CPS. She stated that the children were returned to E.R. when the referrals were resolved. Nassif testified that E.R.'s history was concerning to her in particular because E.R. had been untruthful with Nassif when asked about her CPS history.

Nassif acknowledged that Appellant had completed the services in his family service plan. *See* TEX. FAM. CODE ANN. § 263.307(b)(10) (providing that court may consider willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision); *cf. In re G.C.D.,* 04–14–00769–CV, 2015 WL 1938435, at *10 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (noting trial

court permitted to determine that parent's history of instability was more predictive of future behavior than recent improvements in conduct). Nassif nonetheless testified that it was her recommendation that Appellant's parental rights be terminated. Nassif expressed that she was concerned with Appellant's criminal history and his relationship with E.R. She stated, "[T]he instability of [Appellant's] home and relationship and his past history of providing a safe environment for [S.R.H.] concerns me very much."

Appellant also cites the testimony of the Department's caseworker, Desiree Jones. Appellant points out that Jones testified that she had observed Appellant's supervised visits with S.R.H. and that their relationship seemed appropriate. Jones testified that Appellant and S.R.H. seemed bonded and that S.R.H. seemed comfortable with Appellant.

Appellant's trial testimony indicated that S.R.H. showed him affection when he came to visit her during supervised visits. He also stated that she was happy when she was with him. The evidence also showed that Appellant bought S.R.H. toys and clothes.

Appellant points out that neither the caseworker nor Nassif had observed him with S.R.H. during unsupervised visits. Appellant offered into evidence many pictures showing S.R.H. smiling when she was with him, his girlfriend, and her children while they were doing various activities during unsupervised visits.

As noted by the Department, child advocate Nassif's testimony indicated she did not believe that the bond between Appellant and S.R.H. was that strong. Nassif testified that she had observed supervised visits between Appellant and S.R.H. She described S.R.H.'s interaction with Appellant during the visit as "very strained." Nassif testified that S.R.H. did not seem happy during the visits and that there were no displays of affection between the two.

Nassif also testified that she saw S.R.H. interact with her foster parents many times. She stated that S.R.H. is bonded with her foster parents and refers to them as "Mom" and "Dad." Nassif observed that the S.R.H. and her foster parents have a "loving" and "caring" relationship. When asked why she characterized the relationship this way, Nassif testified, "Just a lot of laughter and smiles and hugs and she does like horseplay with them, silly, rolling on the floor and on them. I mean, just very affectionate between them." Nassif testified that the foster home was safe, stable, and met all of S.R.H.'s physical and emotional needs. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of a child and affirming finding that termination was in child's best interest when child was thriving in foster care); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering child's bond with foster family in reviewing best-interest determination).

Lastly, the foster mother testified that she had spoken to S.R.H. during therapy about the trial. The foster mother stated that, the night before trial, S.R.H. had asked her to "hold her the entire night." She stated that S.R.H. had also cried. The foster mother testified that S.R.H. was afraid of what the outcome of the trial might be and feared that she would be returned to Appellant. *See* TEX. FAM. CODE ANN. § 263.307(b)(5) (listing as factor: whether the child is fearful of living in or returning to the child's home); *see also Holley*, 544 S.W.2d at 371–72 (factor one: the desires of the child).

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Appellant and S.R.H. was in her best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent-child relationship between Appellant and S.R.H.'s was in her best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in S.R.H.'s best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the

parent-child relationship was in S.R.H.'s best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).

We overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Huddle, and Lloyd.